Robert J. McKennon (SBN 123176) *rm@mckennonlaw.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlaw.com*
**McKENNON LAW**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Eric Rogers

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| ERIC ROGERS,<br><br>                    Plaintiff,<br><br>vs.<br><br>BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.:<br><br>Action Filed:<br><br>COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES<br><br>[Filed Concurrently with:<br>-   Civil Cover Sheet;<br>-   Summons; and<br>-   Certification of Interested Parties] |

**NATURE OF ACTION**

1.      Since 2011, Plaintiff Eric Rogers has suffered from severe gastrointestinal health problems, including several stomach tumors and many others, that caused rampant decay of all his teeth and upper and lower jawbones.  His oral decay was so pervasive that, by 2024, his highly esteemed treating physicians determined oral surgery was immediately and medically necessary.  Because of the severity of the decay in his mouth, he could not eat much, chew or speak properly, had lost significant weight, became too weak to perform even basic daily tasks, suffered from malnutrition, and, according to his physicians, was in danger of contracting sepsis and losing his life.  Over the years, Mr. Rogers underwent several major GI surgeries, including a bowel resection, partial removal of his colon, lap band surgery, gastric bypass, and gastrectomy in 2022 (partial stomach removal due to his several tumors).  These health challenges exacerbated his GI issues and caused GERD and chronic and severe vomiting, which took a severe toll on his oral health.  Years of persistent acid exposure eroded his enamel, leading to extensive tooth decay and jawbone loss.  This damage developed gradually, worsening over time until, by 2024, the decay was so rampant that it significantly impaired his overall physical health and medically necessitated three oral surgeries to restore it.

2.      In this lawsuit, Mr. Rogers seeks to recover health insurance plan benefits from Defendant Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA").  He seeks coverage for those surgeries and the general anesthesia that was administered during them.  Mr. Rogers' employer provided a group healthcare plan for the benefit of its employees, including Plaintiff.  Defendant BCBSMA funded the plan through a group insurance policy, subscriber certificate and preferred provider plan.  Plaintiff was enrolled for the coverage when he had the surgeries, but BCBSMA denied coverage and refused to pay.  Specifically, BCBSMA denied Mr. Rogers' claims for: (1) The three oral surgeries performed by his surgeon, Jonathan Ford, D.D.S./D.M.D.; and (2) The related anesthesia services



administered by a different doctor.  Dr. Ford's medical services included tooth extractions, bone grafts,[1] impressions, molds for oral surgical splints, and steel implants anchored in his rebuilt upper and lower jawbones for his entire mouth. These services can be performed only by specialists in oral surgery like Dr. Ford, not a general dentist.

3.    BCBSMA erroneously concluded that: (1) Dr. Ford's services are not covered because they are outpatient "dental services" excluded by the medical plan's dental care exclusion; and (2) The related anesthesia services are not covered under the plan's exclusion for services related to a "non-covered service" (i.e., the purportedly non-covered oral surgeries).  BCBSMA has the burden to prove that these exclusions apply and that they are clear and unambiguous.  Exclusions must be interpreted narrowly against the insurer and in favor of coverage.  BCBSMA cannot meet its burden.  BCBSMA's decision to deny Mr. Rogers' medical claims was arbitrary, capricious, and incorrect because Dr. Ford is not a general dentist but a Doctor of Medical Dentistry that specializes in oral surgery.  Moreover, he performed medical services, not dental services, because they were medically necessary to save Mr. Rogers' life.  And because the procedure codes for the oral surgeries fall under the American Medical Association's coding system, not the American Dental Association.  Indeed, three different physician specialists, including Dr. Ford all attested that the surgeries were medically necessary medical procedures, not dental care.

4.    The plan's insuring clause is extremely broad and explicitly covers all sorts of oral surgeries, including those performed by dentists, if they are medically necessary.  The vague phrase "dental care" in the exclusion is undefined by the medical plan.  That exclusion does not clearly and explicitly preclude coverage for

---

[1] Bone grafting is a surgical procedure that uses transplanted bone to repair and rebuild diseased or damaged bones.  Bone grafts are necessary to repair a decayed jawbone prior to oral implant surgery to replace teeth.  *See* *https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/bone-grafting*, also enclosed.

the oral surgeries at issue.  Because, under federal ERISA common law policy interpretation rules, it must be construed narrowly and against BCBSMA as the drafter, BCBSMA cannot sustain its burden of proof.  The same rationale applies to Mr. Rogers' claims for anesthesiology services because BCBSMA's denial rationale is based entirely on its contention that Dr. Ford's oral surgeries are not covered.

5.      BCBSMA loses for a second and entirely independent reason.  Mr. Rogers' claims must be deemed resolved in his favor under the plan's terms because BCBSMA failed to decide his administrative appeal in a timely fashion.  Finally, any discretionary authority that BCBSMA has under the plan must be significantly reduced because it repeatedly violated ERISA's "full and fair review" procedures during its appeal review, evidencing that it acted on its structural conflict of interest as the plan's funder and claim decider.

6.      BCBSMA improperly failed to pay Plaintiff the benefits due him under the plan, from May 2024 onward, in the amount of $107,290, and he is also entitled to interest and his attorneys' fees.  The employee welfare benefit plan and this action are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

## THE PARTIES

7.      Plaintiff is an individual who, at all times relevant to this action, was a citizen and resident of the State of California, City of Huntington Beach, in Orange County.  At all times relevant to this action, Plaintiff was a participant, as defined by Section 3(7) of ERISA, 29 U.S.C. Section 1002(7), in the employee welfare benefit plan that is at issue in this action and was established by his employer, Optos, Inc.

8.      Defendant BCBSMA is, and at all times relevant was, a Massachusetts non-profit corporation and health insurance company with its principal place of business located in Boston, Massachusetts.  Defendant BCBSMA, at all times relevant, administered health insurance benefits provided to Optos employees, including Plaintiff, by issuing an ERISA group health insurance contract, Subscriber



Certificate, and Blue Care Elect Preferred Provider Plan to Mr. Rogers' employer, also the plan's sponsor, Optos, Inc., for the benefit of its enrolled employees.  The contract and plan documents consist of the Subscriber Certificate, the agreement between Optos and BCBSMA, the riders, the Schedule of Benefits, and the employee's enrollment form (the "Plan").  The Subscriber Certificate, which BCBSMA issued, is and was the funding source of the health benefits for Optos' employee welfare benefit plan.  BCBSMA is responsible to pay healthcare benefits and provide healthcare coverage due under the Plan.  The Plan, including BCBSMA through the Subscriber Certificate, promised to provide access to healthcare services and benefits and to pay and reimburse healthcare expenses incurred by Plaintiff should the expenses meet the Plan terms.  Defendant BCBSMA has acted as a claims administrator and as an ERISA claims fiduciary of the Plan, including the Subscriber Certificate, in connection with healthcare benefits.

9.     The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained. DOES 1 through 10 are sued as principals and/or agents, servants, attorneys and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

## JURISDICTION AND VENUE

10.     Plaintiff brings this action to recover health insurance benefits and to enforce and clarify his rights under Section 502(a)(1)(B) of ERISA, 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's



claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

11.     Venue is proper in the Central District of California pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, the alleged breaches occurred in this district, and the ERISA-governed plan at issue was administered in part in this district.  Venue is also proper pursuant to 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this district.  Namely, BCBSMA denied Plaintiff's claim (May 2024) and appeal (December 2024) in Huntington Beach, California, in Orange County, within this district.  Plaintiff received the oral surgeries, anesthesia, and healthcare services that are at issue in this litigation in Huntington Beach, California, where his oral surgeon's office is located.  Plaintiff has resided in and has been domiciled in Huntington Beach, California, in Orange County, within this district, for numerous years, and he continues to reside in and be domiciled here presently.  That is where Plaintiff resided and was domiciled in May 2024 when BCBSMA denied his claim and refused to pay his benefits, in December 2024 when BCBSMA denied his appeal, and presently.

12.     Plaintiff alleges that Defendant BCBSMA is, and at all times relevant was, duly authorized to do, and doing, business within the County of Orange, State of California, within the judicial district of the Central District of California.

## FACTUAL BACKGROUND AND ARGUMENTS

### 1.   STATEMENT OF RELEVANT FACTS

#### A.   The Healthcare Plan

13.     BCBSMA issued an ERISA group health insurance contract and Subscriber Certificate to Mr. Rogers' employer, Optos, for the benefit of its enrolled employees, including Mr. Rogers.  Those contracts are part of the Optos healthcare Plan documents, of which Optos is the sponsor.  The Subscriber Certificate and insurance policy in it is a PPO.  BCBSMA is responsible to provide access to



healthcare services and benefits and to pay healthcare expenses for covered services provided by doctors, dentists, and other covered healthcare providers to Plan members like Mr. Rogers, including to reimburse members like Mr. Rogers for the expenses he incurs that are covered by the Plan.

14.    The Subscriber Certificate includes the following broad insuring clause for all sorts of outpatient surgery, including surgery performed by a dentist, related anesthesia services, certain types of oral surgeries specifically listed, and other types of oral surgeries not explicitly listed:

> **Part 5**
> **Covered Services**
> You have the right to the coverage described in this part, except as limited or excluded in other parts of this Subscriber Certificate. . . .
>
> **Surgery as an Outpatient**
> This health plan covers *outpatient* surgical services when they are furnished for you **by a *covered provider***. . . . **This coverage includes**: . . .
>
> ☐ **Surgical procedures**. This includes emergency and scheduled surgery. This coverage includes (**but is not limited to**): . . .
>
> • **Oral surgery.** This means: reduction of a dislocation or fracture of the jaw or facial bone; excision of a benign or malignant tumor of the jaw; and orthognathic surgery that you need to correct a significant functional impairment that cannot be adequately corrected with orthodontic services. . . . This coverage is also provided when the surgery is furnished at an oral surgeon's office. (Orthognathic surgery is not covered when it is performed mainly for cosmetic reasons. . . .)
>
> • **Non-dental surgery** and necessary postoperative care that is furnished for you **by a dentist** who is licensed to furnish the specific *covered service*. (See Part 6, "Dental Care.") . . .
>
> ☐ **Anesthesia services** that are related to covered surgery.
> (Italic emphasis in original to delineate defined terms; bold headings in original; other bold emphasis added).

15.    The Plan includes the following pertinent definitions:

> **Part 2**
> **Explanation of Terms**
> The following words are shown in italics in this Subscriber Certificate, your *Schedule of Benefits*, and any *riders* that apply to your coverage in this health plan. The meaning of these words will help you understand your benefits. . . .
>
> **Covered Providers**



The kinds of health care providers that are *covered providers* are those that are listed below in this section. . . .

    ☐ **Physician and Other Covered Providers.** These kinds of health care providers are: certified registered nurse anesthetists; chiropractors; . . . **dentists**; . . . physical therapists; physicians; physician assistants; . . . .

**Covered Services**
This Subscriber Certificate and your *Schedule of Benefits* describe the health care services and supplies for which [BCBSMA] will provide coverage for you while you are enrolled in this health plan. . . . These health care services and supplies are referred to as "*covered services*." Except as described otherwise in this Subscriber Certificate, all *covered services* must be *medically necessary* for you, furnished by *covered providers* and, when it is required, approved by [BCBSMA]. . . .

**Medical Necessary (Medical Necessity)**
To receive your health plan coverage, all of your health care services and supplies must be *medically necessary* and appropriate for your health care needs. . . . [per] the guidelines described below.

    All health care services must be required services that a health care provider, using prudent clinical judgment, would provide to a patient in order to prevent or to evaluate or to diagnose or **to treat an illness, injury, disease, or its symptoms**. And, these health care services must also be: . . . ☐ Essential **to improve your net health outcome** . . . .

This does **not** include a service that: is primarily for your convenience . . . **improves your appearance** or how you feel about your appearance . . . .

**Outpatient**
The term "outpatient" refers to your status as a patient. . . . You are also an *outpatient* if you are getting *covered services* . . . **at a provider's office** (this can be either in-person or via telehealth), or in other covered outpatient settings, or at home. . . .
(Italic emphasis in original to delineate defined terms; bold headings in original; other bold emphasis added).

16.    The Plan includes the following pertinent dental care and non-covered services exclusions found in Part 6:

**Part 6**
**Limitations and Exclusions**
Your coverage in this health plan is limited or excluded as described in this part. . . .

**Dental Care**
Except as described otherwise in this Subscriber Certificate or your *Schedule of Benefits*, **no benefits are provided for** treatment that [BCBSMA] determines to be for **dental care**. This is the case even when the dental condition is related to or caused by a medical condition or medical treatment. . . .

**Non-Covered Services**
No benefits are provided for: . . .



☐ A service or supply that is furnished along with a non-*covered service*.

(Italic emphasis in original to delineate defined terms; bold headings in original; other bold emphasis added).

17.    The Plan does not define "dental care" or "oral surgeon."  Nor does it specifically exclude from covered services an oral surgery to perform tooth extractions, bone grafts, and titanium jawbone implants that are medically necessary, not cosmetic, because a member has severely decayed teeth and jawbones that would prevent him from eating.  The Schedule of Benefits, which is part of the Plan, states that "Surgery as an Outpatient" is a covered service.  The Schedule lists only one outpatient surgery that is excluded from coverage: "excludes removal of impacted teeth whether or not the teeth are imbedded in the bone."

18.    The Plan, at Part 4, has a procedure for submitting pre-service approval of medical claims.  The Plan provides that a member "must receive a pre-service approval from [BCBSMA] for: Certain *outpatient* specialty care, procedures, services, and supplies.  Some examples of services that may require prior approval include: some types of surgery . . .."  The Plan provides that BCBSMA, from time to time, "may change the list of health care services and supplies that require a prior approval."  The Plan does not limit a provider or member from requesting a pre-service approval, even if one is not required.  The Plan states that, "You must file a claim within two years of the date you received the *covered service*," but it does not limit pre-service filing.  Subscriber Cert., Part 9, p. 82.

19.    The Plan, at Part 10, has the procedures for appeals and appeal reviews and decisions.  The Plan allows for one internal appeal.  The Plan imposes a 30-day deadline for BCBSMA to review and decide a member's internal appeal, unless BCBSMA extends that deadline because it needs additional time to obtain the member's medical authorization to get his medical records:

**Response Time for an Appeal or Grievance Review**
The review and response for an internal formal *appeal* or *grievance* review **will be completed within 30 calendar days**.



. . . *Blue Cross and Blue Shield* may also extend the 30-calendar-day time frame when the review requires your medical records **and *Blue Cross and Blue Shield* needs your authorization to get these records**. The 30-day response time will not include the days from when *Blue Cross and Blue Shield* **sends you the authorization form** to sign until it receives your signed authorization form. . . . (Italic emphasis in original to delineate defined terms; bold headings in original; other bold emphasis added).

The Plan, in the same subsection, imposes the following consequence if BCBSMA untimely decides a member's internal appeal:

**Response Time for an Appeal or Grievance Review**
. . . .
An *appeal* or *grievance* **that is not acted upon within the time frames** specified by applicable federal **or** state law **will be considered resolved in favor of the *member*.** (Italic emphasis in original to delineate defined terms; bold headings in original; other bold emphasis added).

**B.    The Claims Process, Medical Evidence, and BCBSMA's Denial and Appeal Denial Decisions**

20.    On February 29, 2024, Dr. Ford,[2] Mr. Rogers' doctor of medical dentistry involved in the specialty practice of oral surgery and medicine, not routine dental care, examined Mr. Rogers in his clinic for a second opinion on whether he would need oral surgery for his severely decayed teeth.  Mr. Rogers reported his medical history of stomach tumors, several stomach resection surgeries to remove the tumors, and resulting severe gastroesophageal reflux disease ("GERD") (a chronic condition that occurs when stomach contents leak into the esophagus, causing emesis/vomiting and other issues) and laryngopharyngeal reflux ("LPR") (a form of acid reflux) "during months long bout of stomach cancer surgery and recovery."[3]  Dr. Ford performed a clinical exam and concluded that Mr. Rogers "has

---

[2] Dr. Ford graduated from the University of Pennsylvania School of Dental Medicine in 2007.  He is a Doctor of Dental Surgery ("D.D.S."), also a Doctor of Dental Medicine ("D.M.D.").  He has specialty training in oral surgery.  He is the principal of Ford Dental Group and regularly performs oral surgeries.  He attested that he is "a dentistry medical doctor deeply involved in the practice of medicine, particularly within surgical interventions and treatments related to the musculoskeletal system."  He practices medicine, not routine dental care.
[3] According to the medical literature, GERD, LPR, and frequent vomiting each cause tooth decay from exposure to stomach acids.  *See* (1) Lechien JR, Chiesa-

Footnote continues on next page…



rampant decay" and needs a "full mouth extraction" and replacement of all his teeth.
Dr. Ford explained to Mr. Rogers his two options: surgically placing implants with
hybrid dentures or surgically placing implants with crowns.  That he would need to
remove all his teeth and the deteriorated parts of his upper and lower jawbones,
insert titanium implants into his jawbones (a boned anchored device for the
prosthetic dentures or crowns), and replace his extracted teeth with dentures or
crowns.  He further assessed that his patient's "Stomach cancer and side [e]ffects of
stomach cancer [vomiting, acid reflux] contributed to rampant decay and need for
full mouth extraction and all on x/hybrid dentures as treatment of choice for the
patient."  Dr. Ford documented and concluded that his recommended oral surgery
treatment was medically necessary because Mr. Rogers "will have compromised
health since patient will not have c[a]pacity to adequately chew/digest food" if his
teeth are not fixed.  Dr. Ford took several X-rays, extraoral photos, and intraoral
scans of his patient's teeth and jawbones that showed they were severely decayed
from months of stomach tumor side effects (repeat vomiting, acid reflux).  These
were later provided to BCBSMA with claim forms and via email.

21.    On March 4, 2024, Dr. Ford wrote a letter to BCBSMA that explained
in detail the oral surgeries that he needed to perform on Mr. Rogers (surgically
extract all his teeth in upper and lower jaw, remove decayed jawbone sections, bone
grafting to replace decayed jawbone areas to preserve ridge integrity for titanium
implants anchored into the jawbones, surgical stents to apply pressure to his soft

---

Estomba CM, Calvo Henriquez C, Mouawad F, Ristagno C, Barillari MR, Schindler
A, Nacci A, Bouland C, Laino L, Saussez S. Laryngopharyngeal reflux,
gastroesophageal reflux and dental disorders: A systematic review. PLoS One. 2020
Aug 14;15(8):e0237581. doi: 10.1371/journal.pone.0237581. PMID: 32797062;
PMCID: PMC7428125, p. 1, found at
*https://pmc.ncbi.nlm.nih.gov/articles/PMC7428125/#:~:text=The%20study%20resu
lts%20supported%20a,patients%20compared%20with%20healthy%20individuals*
("24 studies were kept for analysis" of GERD and LPR patients, and the "study
results supported a higher prevalence of [tooth] erosion and caries in reflux patients
compared with healthy individuals."); and (2) Nausea Effects on Oral Health, found
at *https://downingtowndentistry.com/2021/10/01/nausea-effects-on-oral-
health/#:~:text=Vomiting%20and%20Oral%20Health,losing%20some%20of%20yo
ur%20teeth*.

tissue/gums to allow healing and preserve opening for implants, implant supported

denture for upper and lower teeth).  Dr. Ford explained that his patient's oral health

condition was compromised from his previous repeat medical gastrectomy surgeries

(portions of stomach removal from tumors), which caused "gross decay and severe

infections on his entire maxillary and mandibular dentition [upper and lower teeth]."

He concluded that the oral "surgery is medically necessary to provide adequate

protection as well as sufficient structural integrity and function which will allow Mr.

Roger's to masticate [chew] normally, speak normally and have a very much

improved quality of life including his overall health and well being."  Further, **that

his oral surgery "is medically necessary-not dentally."** (Emphasis added).  He

provided the Current Procedural Terminology ("CPT") codes for these procedures,

41899, 20900, 21089, and 21085.

   22.    On March 4, 2024, Jill M. Panitch, M.D., Mr. Rogers' longstanding

board-certified family medicine physician of 15 years, wrote a letter that echoed

what Dr. Ford said.  She explained that her patient had a long bout with GI issues

and surgeries including acid reflux that eroded all his teeth and would require a full

mouth reconstruction:

> Eric Rogers . . . has a very complex medical history pertaining to his GI
> health. He has had multiple stomach surgeries including Lap band,
> multiple revisions due to medical complications, and a more recent
> partial Gastrectomy 2/28/2022. Due to these underlying stomach
> complications he has had chronic acid reflux which has in turn
> damaged his teeth. Due to the chronic erosion of his teeth he now
> requires full mouth reconstruction.

Dr. Panitch explained the same oral surgery procedures that Dr. Ford did.  She

concluded that, "This surgery is medically necessary due to the factors listed

above."  And that, "This surgery is deemed medically necessary to enable Mr.

Rogers to chew and speak normally, thereby enhancing his overall quality of life,

health, and well-being. These procedures must be carried out . . . as they fall under

medical necessity . . .."



23.     On March 11, 2024, John C. Lipham, M.D., Mr. Rogers' highly decorated GI and surgical oncologist and USC medical school professor, wrote a letter in line with all of Mr. Rogers' other attending doctors.[4]  Dr. Lipham explained that he has treated Mr. Rogers since 2021 with several GI surgeries, including his most recent February 2022 stomach tumor partial gastrectomy surgery.  He stated that, "As a result of these procedures, he experiences chronic symptoms including gastroesophageal reflux disease (GERD), severe emesis, and anemia" which "have contributed to significant tooth decay and infection, which are adversely affecting" his health.  He concluded that, in his professional medical opinion, Mr. Rogers needs a full mouth reconstruction, that said oral surgery procedure is medically necessary for the following reasons: (1) "This procedure is medically necessary for mitigating the risk of sepsis and preserving his overall well-being;" (2) If his mouth infection is not promptly corrected, he has a heightened risk of recurrence of septic shock and organ failure given his history of those conditions; (3) Without the oral surgery, his medical status will continue to decline "leading to limited or complete loss of basic life-sustaining activities of daily living (ADLs);" (4) To prevent further deterioration of his health; and (5) The oral surgery "is essential for his ongoing medical care and quality of life."

24.     On March 13, 2024, Dr. Ford submitted claims to BCBSMA, and requested pre-authorization, for the oral surgeries that he would perform on his patient, Mr. Rogers, which totaled $100,750.  He disclosed that the procedures would be performed on all his patient's teeth, his entire mouth, as an outpatient in his office.  The oral surgery procedures, which he wrote on the claim forms, specifically included: (1) Miscellaneous oral surgery procedures in the ridge of his jawbones including 23 teeth extractions (CPT code 41899); (2) Bone grafts for eight

---

[4] Dr. Lipham is a medical Professor of Clinical Surgery at Keck School of Medicine of USC, and its Division Chief of Upper GI and General Surgery, Director Foregut Cancer Program, and Chief of USC Affiliated Academic Programs at Hoag Memorial Hospital.  He is also with Hoag-USC Digestive Disease Center and Cancer Institute.  He is specialized in GI and stomach cancer and surgery.

teeth (surgical procedure to transplant bone tissue to rebuild damaged jawbones),
impressions, and preparation of oral surgery splints for eight teeth (CPT code
20900); and (3) Maxillofacial surgery including maxillary prosthetic procedure and
mandibular prosthetic procedure (oral surgery to place dentures anchored by
titanium implants into rebuilt upper and lower jawbones) (CPT code 21089).[5]  Dr.
Ford submitted: (1) His claim forms for these procedures; (2) The above-referenced
March 2024 letters of medical necessity from Dr. Ford, Dr. Panitch, and Dr.
Lipham; and (3) Dr. Ford's February 29, 2024 clinical exam notes.  BCBSMA
documented in its claim logs that the procedures requested by Dr. Ford fell under
CPT codes for these services.

25.     On March 13, 2024, Mr. Rogers emailed to BCBSMA Dr. Ford's
photos and X-rays of his teeth and jawbones.  On March 26, 2024, Mr. Rogers
directly submitted the same oral surgery claims to BCBSMA that his provider, Dr.
Ford, did on March 13, 2024.  He provided all the same supporting medical
necessity documentation and teeth photos.

26.     On March 15, 2024, BCBSMA emailed Mr. Rogers and stated that the
services are dental procedures, not medical, and that his BCBSMA policy does not
cover dental services.

27.     On March 28, 2024, BCBSMA spoke with Dr. Ford's office on the
phone and informed them that no coverage existed for the procedures.  BCBSMA
admitted that Mr. Rogers' teeth and jawbone issues were caused by his medical
conditions, but BCBSMA said the procedures were dental services that would be
covered under a dental benefit plan, not its medical Plan.

28.     On April 12, 2024, BCBSMA issued a Summary of Health Plan

---

[5] Maxillofacial surgery is oral surgery performed by a highly trained dental surgeon
specialist, not routine dental care, and it includes teeth extractions, bone grafts, and
placement of implants into the jawbone (like what occurred here).  *See*
*https://my.clevelandclinic.org/health/procedures/maxillofacial-surgery*, which was
also enclosed with Mr. Rogers' appeal letter to BCBSMA (but which BCBSMA
failed to include in its administrative record).



Benefits, also known as an Explanation of Benefits ("EOB"), to Mr. Rogers. BCBSMA explained (disingenuously) in the EOB that his claim for Dr. Ford's $100,750 in services (the two surgeries) are not covered because "BENEFITS CANNOT BE CONSIDERED BECAUSE THE SERVICES WERE BILLED BEFORE THEY WERE ACTUALLY PERFORMED" and not covered because they are not medically necessary. (Capital emphasis in original).

29.    Despite that, on April 16, 2024, because his patient's medical health depended on it, Dr. Ford performed oral surgery on Mr. Rogers under local anesthesia. Dr. Ford was in the process of performing extractions of all his teeth, bone grafts, impressions and molds for oral surgical splints, and implant insertions (to be performed later). However, under just local anesthesia, Mr. Rogers had pain, and his vitals spiked because of stress from the surgery. Dr. Ford performed these oral surgery procedures on part of Mr. Rogers' jawbone and teeth and decided that he needed to complete the procedure on another day. He removed some of his decayed teeth and the deteriorated jawbone underneath those teeth, then packed the deteriorated jaw with new transplant bone material, in preparation for surgically placed implants screwed into the rebuilt jawbone for his prosthetic maxillary and mandibular dentures.

30.    On April 29, 2024, Dr. Ford wrote three letters of his medical opinions, one for each of the relevant CPT procedure codes he put on his claim form for Mr. Rogers' oral surgeries. In these letters, Dr. Ford explained that **CPT codes are "medical procedure" codes, not dental procedure codes**. (Emphasis added). That the American Medical Association ("AMA"), a reputable medical organization, developed, maintains, and oversees the CPT code system. Dr. Ford explained further that the American Dental Association ("ADA") has its own set of procedure codes called the Current Dental Terminology ("CDT") which are separate and distinct from the AMA's CPT codes. "This separation further emphasizes the delineation between dental and medical procedures, each with its respective coding



system to reflect the nature and context of the services provided." Dr. Ford attested that the oral surgeries he performed (and would perform) on Mr. Rogers **are classified under the AMA's CPT code system, not the ADA's CDT code system, because they are medical not dental procedures**.

31.    Dr. Ford explained specifically why each of the three CPT procedure codes on his claim form are medical not dental procedures. First, he opined that, in his professional opinion as a University of Pennsylvania educated "dentistry medical doctor deeply involved in the practice of medicine" with two decades of oral surgery experience, AMA CPT code 21089 is "**indisputably considered a medical code rather than a dental code**." (Emphasis added). Dr. Ford attested that the AMA's CPT code 21089 includes oral surgery – the preparation and fitting of a custom oral surgical splint and placement of a bone anchored device – the "complexity, purpose, and application" of which "**fall squarely within the medical domain, surpassing the scope of routine dental care**." (Emphasis added). Dr. Ford opined that CMT code 21089 is a **"medical classification"** because: (1) It is an AMA code, not a dental code by the ADA; (2) The AMA categorized it as a musculoskeletal system procedure, "a classification that clearly delineates it as a **medical procedure**;" (3) The surgery "involves a level of invasiveness typical of **medical** interventions" and is performed by "professionals with advanced training in oral and maxillofacial surgery;" (4) Preparing and fitting a custom oral surgical splint and placing a bone anchored device are complex surgery procedures that "require specialized **medical expertise**, further supporting the **medical nature** of CPT code 21089;" (5) "Despite involving the oral cavity, the procedure's intent—to facilitate speech through the placement of a bone-anchored device—**exceeds the boundaries of traditional dental care, indicating a medical approach** to treatment;" and (6) The code is included in the "**medical billing system**" used by healthcare providers and health insurance companies, which "reinforces its status as a **medical code**." (Emphasis added). Dr. Ford summed up by opining that, "In light of these points, it is evident



that CPT code 21089 represents a **medical procedure** that requires the advanced knowledge and skills associated with [a] doctorate in **medical** dentistry practice. The code's designation by the **AMA**, its utilization in **medical billing**, and the nature of the intervention itself collectively affirm its **medical classification**." (Emphasis added).

32.     Second, Dr. Ford concluded that, "I firmly believe that [AMA] CPT code 20900 falls within the realm of **medical practice rather than dental care**." (Emphasis added).  He attested that CPT code 20900 is the AMA's **medical procedure** code for oral cavity bone grafting surgery, "a critical aspect of surgical interventions aimed at restoring bone structure and function, typically performed by **medical specialists** in fields such as doctor of medical dentistry, oral and maxillofacial surgery, and other related disciplines." (Emphasis added).  Dr. Ford opined that CMT code 20900 is a **"medical classification"** because: (1) It is an AMA code, not a dental code by the ADA; (2) The AMA categorized it as a musculoskeletal system procedure "aligning it with **medical procedures** that address bone-related conditions and treatments;" (3) Performing bone grafting procedures involves complex surgical techniques to repair or augment bone structure that "necessitat[es] specialized **medical expertise** and training;" (4) Bone grafting surgery "requires a high level of specialized knowledge and skill in areas such as bone biology, surgical techniques, and postoperative care, characteristics commonly associated with **medical professionals rather than general dental practitioners**;" (5) "Bone grafting plays a crucial role in various **medical specialties**, including doctor of medical dentistry, oral and maxillofacial surgery, and reconstructive surgery, highlighting its significance in **medical practice**;" and (6) The code is included in the "**medical billing system**," which "reflects its recognition as a **medical procedure** eligible for reimbursement in the healthcare industry." (Emphasis added).  Dr. Ford summed up by opining that, "In light of these factors, it is evident that CPT code 20900, specifically pertaining to bone

grafting procedures, should be classified as a **medical code**.  The complexity,
specialized expertise, and **medical relevance** of bone grafting underscore its
position within the domain of **medical practice, distinct from routine dental
care**." (Emphasis added).

33.     Third, Dr. Ford attested that CPT code 41899 is the AMA's "**medical
procedure** code within the range of 'Other Procedures on the alveolar Structures,' "
which includes "unique or uncommon procedures performed on alveolar structures,
including teeth, jaws, and related structures, which may require **specialized medical
expertise** and intervention that patients such as Eric Rogers required."[6] (Emphasis
added).  Dr. Ford opined that CMT code 41899 is a **"medical classification"** for
similar reasons as the other CPT codes: (1) It is an AMA code, not a dental code by
the ADA, and the AMA, a medical organization, maintains and updates the CPT
code set "to accurately reflect **medical procedures** across various specialties;" (2)
Alveolar structure procedures, particularly complex interventions like Mr. Rogers
had, "often require a combination of dental and **medical knowledge**;" and (3) Code
41899 requires healthcare providers "to collaborate across dental and medical
specialties to deliver comprehensive care that addresses both dental and medical
aspects of the patient's condition." (Emphasis added).

34.     On May 10, 2024, Mr. Rogers spoke with a BCBSMA claim
representative on the phone.  She explained (disingenuously) that his oral surgery
claims would be denied because the Plan does not cover services performed by a
dentist or a "D.M.D." and because the claims were submitted too early.  BCBSMA
was obviously incorrect.  BCBSMA's website for the Plan's in-network providers
include several DMDs and dentists, for example: (1) Arman Sherwin, D.M.D. (listed
as providing oral and maxillofacial surgery, just like Dr. Ford provided Mr. Rogers);

---

[6] The alveolar bone is composed of the ridges of the jaw that support the teeth. The
roots of the teeth are contained in deep depressions, the alveolar sockets in the bone.
*See https://www.sciencedirect.com/topics/immunology-and-microbiology/alveolar-bone*.



and (2) Brian Y. Goo, D.D.S.[7]   And the Plan permits pre-service claims.

35.   On May 10, 2024, Mr. Rogers resubmitted the same oral surgery claims that totaled $100,750 to BCBSMA.

36.   On May 10, 2024, BCBSMA issued another EOB to Mr. Rogers. BCBSMA changed its denial rationale again.  It explained in the EOB that his claim for Dr. Ford's $100,750 in services are not covered because "BENEFITS ARE NOT AVAILABLE UNDER YOUR PLAN FOR THIS SERVICE." (Capital emphasis in original).

37.   On May 20, 2024, Dr. Ford performed a second oral surgery on a different part of Mr. Rogers' jaw under general anesthesia.  Salman Hussain, D.M.D., a Doctor of Dental Medicine and anesthesiologist, put Mr. Rogers to sleep for the second surgery because of his pain and vital sign problems during the first surgery.  Dr. Hussain determined that general anesthesia was medically necessary because of Mr. Rogers' reaction during the first surgery under local anesthetics, and he diagnosed him with: (1) Anxiety State; and (2) Acute Reaction to Stress.  Dr. Ford performed the same medically necessary medical procedures as before, tooth extractions, bone grafts, impressions and molds for oral surgical splints, in preparation for the implants and dentures, because of Mr. Rogers' severely decayed, non-functional teeth and upper and lower jawbones.[8]

38.   On May 22, 2024, BCBSMA denied Mr. Rogers' $100,750 in claims for Dr. Ford's oral surgeries (in a formal written denial letter).[9]  BCBSMA noted the nature of his claims, i.e., for services by Ford Dental Group that included "tooth extraction, bone grafting and impressions, and molds for oral surgical splints from Jonathan Ford."  BCBSMA concluded that Dr. Ford's services are not covered by

---

[7] Screenshots of these dentist providers were enclosed with Mr. Rogers' appeal letter to BCBSMA, but BCBSMA failed to include them in its administrative record.
[8] Mr. Rogers had more complications during the second surgery, which required a third surgery and will require a future fourth surgery.  The same procedures were and will be performed at each surgery for the same total cost of $100,750 (plus anesthesia costs).
[9] BCBSMA did not issue and send the denial letter until May 29, 2024.



the Plan because they were outpatient "dental services" excluded by the Plan's
dental care exclusion:

> We could not approve coverage as there are no benefits for this service
> in your plan's subscriber certificate: Per subscriber certificate Part 6
> Limitations and **Exclusions**: "Dental Care: **no benefits are provided**
> for treatment that Blue Cross and Blue Shield determines to be **for
> dental care**. This is the case even when the dental condition is related
> to or caused by a medical condition or medical treatment. . . .." **The
> services requested are dental services** as an outpatient in a dental
> office. **There is no coverage for this service** under your medical plan.
> (Emphasis added).

In its written denial letter, BCBSMA did not include the other reasons it had
previously told Mr. Rogers on the phone and in EOBs that it would deny his claims:
premature claims, services performed by a DMD, and not medically necessary.

39.     On June 11 and October 31, 2024, Mr. Rogers submitted claims to
BCBSMA for Dr. Hussain's general anesthesiology services performed during the
May and October 2024 oral surgeries, in the amounts of $3,740 and $2,800.  On
October 4, 2024, Dr. Ford performed a third oral surgery for the same types of
procedures because Mr. Rogers again had complications during the second oral
surgery.  Dr. Ford is still charging the same total price for these oral surgeries,
$100,750, despite that they occurred on three days.  Therefore, the claims submitted
to BCBSMA total $107,290, no part of which BCBSMA has paid.

40.     On November 18, 2024, Mr. Rogers, through his counsel, appealed
BCBSMA's May 2024 decision to deny his benefit claims (for Dr. Ford's oral
surgeries).  Counsel faxed, emailed, and mailed his appeal to BCBSMA on that date.
BCBSMA's administrative record confirms that it received the fax and email copies
of his appeal on November 18, 2024.  With the mail copy, counsel submitted a disc
with electronic copies of the following documents:

- A personal statement from Mr. Rogers testifying to his phone calls with
  BCBSMA and the wavering denial rationales it gave him, his medical history
  of stomach tumors and acid reflux that caused all his teeth and jawbones to



rampantly decay to the point it adversely affected his medical health, and the nature of the oral surgeries that Dr. Ford performed;

- Medical literature regarding: the oral surgery procedures Dr. Ford performed, Mr. Rogers' medical conditions that caused his teeth and jawbones to seriously decay, and impacted teeth (the only outpatient oral surgery that the Plan specifically excluded);

- Screenshots of BCBSMA's website for its health Plan that shows its Plan covers services provided by dentists and Doctors of Medical Dentistry like Dr. Ford;

- Bios of Mr. Rogers' treating doctors, both Dr. Ford, his oral surgery specialist, and his specialists in his stomach tumors and GI conditions;

- Letters from Dr. Ford and Mr. Rogers' treating physicians that explain the medical necessity of Dr. Ford's oral surgeries and that they constitute medical services, not dental services;

- Surgery records from Dr. Ford for the oral surgery procedures he performed;

- Mr. Rogers' claims for anesthesiology services for his oral surgeries; and

- Other miscellaneous documents.

Mr. Rogers' counsel, in a detailed, 20-page appeal letter, summarized and explained the significance to BCBSMA of each enclosure. And counsel argued why under the Plan's terms and ERISA law, Mr. Rogers' claims were covered. BCBSMA ignored Mr. Rogers' appeal letter and enclosures.

41.    On November 25 and 26, 2024, BCBSMA obtained Dr. Ford's medical records. Dr. Ford's office faxed them to BCBSMA on those dates. Dr. Ford did not require, and BCBSMA did not need to obtain, a signed authorization form from Mr. Rogers to get his medical records. BCBSMA's claim logs reflect that it called Dr. Ford's office directly on those dates and got his records directly without requesting or needing a signed authorization from Mr. Rogers.

42.    On November 27, 2024, BCBSMA received a duplicate copy of Mr.



1   Rogers' appeal letter in the mail, together with the disc of enclosures to his appeal.
2   A photo of the enclosures disc is in BCBSMA's record.  However, despite its receipt
3   of the disc, BCBSMA failed to include in its record the actual mailed appeal letter
4   enclosures.  BCBSMA received voluminous enclosures on the disc, but it failed to
5   review them, consider them, or place them in its record (other than a photo of the
6   disc).  Aside from the fact that BCBSMA's did not place these appeal letter
7   enclosures in its record, the fact that it did not review them is also evidenced by its
8   claim logs.  Its contemporaneous claim logs contain no notations that BCBSMA
9   reviewed, summarized, or considered the enclosures to Mr. Rogers' appeal letter,
10  nor does any other part of its administrative record.

11          43.     On December 17, 2024, based mostly on the same rationale, BCBSMA
12  prepared a letter which denied Mr. Rogers' appeal and reaffirmed its May 2024
13  denial decision.  BCBSMA again concluded that Dr. Ford's oral surgeries are not
14  covered because they are "dental services" and thus excluded under the Plan's Part 6
15  "dental services" exclusion.  BCBSMA denied Dr. Hussain's anesthesia services
16  under the Part 6 exclusion that states, "No benefits are provided for: . . .• A service
17  or supply that is furnished along with a non-covered service."  In other words,
18  BCBSMA reasoned that because Dr. Ford's surgeries are not covered, neither is the
19  anesthesia furnished along with the purportedly non-covered surgeries.  BCBSMA
20  did not summarize, discuss, or even identify any of the voluminous enclosures Mr.
21  Rogers' counsel sent to BCBSMA with his appeal letter.  BCBSMA authored a
22  cursory, conclusionary, two-page letter that did not attempt to refute any of the facts
23  or arguments in Mr. Rogers' 20-page appeal letter.  BCBSMA again abandoned the
24  other reasons it had previously told Mr. Rogers that it would deny his claims:
25  premature claims, services performed by a DMD, and not medically necessary.
26  BCBSMA explicitly clarified that it is not contesting medical necessity (despite the
27  fact that it did contest medical necessity earlier).
28          44.     BCBSMA did not mail its appeal denial letter on December 17 despite



1   the fact that the BCBSMA appeals case specialist that authored it, "Melissa M.,"

2   dated it "December 17, 2024."  BCBSMA's claim file shows that on December 17,

3   2024 at 12:27 p.m., during the Holiday season, Melissa M. sent an internal email to

4   the mailroom and requested, "Will you please mail this letter for me? It does have to

5   be mailed certified."  BCBSMA's administrative record does not include any return

6   email from the mailroom acknowledging her request.  Nor any evidence of when

7   BCBSMA actually mailed the letter, including without limit a receipt of certified

8   mailing with the mailing date from the post office.  BCBSMA should have evidence

9   in its record of when it mailed the letter because Melissa M. asked that it be mailed

10  certified.  Mailing date evidence is not in BCBSMA's record despite the fact that the

11  post office would have provided a receipt to BCBSMA that verified the mailing date

12  (if it sent the letter via certified mail).[10]

13          45.    BCBSMA's claim logs reflect that on December 17, 2024 at 12:35

14  p.m., "Appeal letter sent to mailroom to manually mail letter to meet TAT [the 30-

15  day turnaround time required by the Plan]."  But, again, the claim logs are silent

16  regarding when BCBSMA actually mailed its appeal denial letter to Mr. Rogers.

17          46.    On January 7, 2025, Mr. Rogers received BCBSMA's appeal denial

18  letter, which is dated December 17, 2024, 21 calendar days after the date of the

19  letter, casting doubt that BCBSMA mailed the letter on December 17.  "The time it

20  takes for a letter to get from Massachusetts to California can vary, but on average it

21  can take 3 to 7 business days."[11]  "USPS takes one to five business days to deliver

22

23  ---

    [10] *See https://store.usps.com/store/product/certified-mail-receipt-forms-*
    *P_FORM_3800#:~:text=Certified%20Mail%20Receipts.-*
24  *,A%20Domestic%20Certified%20Mail%20Receipt%20is%20available%20at%20th*
    *e%20time,they%20may%20be%20shipped%20separately.&text=Free%20Shipping-*
25  *,Expedited%20packaging%20supplies%20are%20shipped%20via%20USPS%20Gr*
    *ound%20Advantage%C2%AE,if%20you%20are%20not%20available.&text=Exped*
26  *ited%20Shipping-*
    *,Expedited%20packaging%20supplies%20can%20be%20shipped%20via%20Priori*
27  *ty%20Mail%C2%AE,on%20distance%20for%20a%20fee* ("A Domestic Certified
    Mail Receipt provides the sender with a mailing receipt and, upon request electronic
28  verification that an article was delivered . . ..")
    [11] *See https://brainly.com/question/38530644.*

1  regular mail to another state."[12]  USPS takes five business days to deliver mail from

2  Massachusetts to California.[13]  "Saturday is a regular day of business for USPS."[14]

3  USPS observes only two legal holidays during this period, Christmas and New

4  Year's Day.[15]  Thus, USPS had 17 business days from December 17, 2024 to

5  January 7, 2025, the reasonable inference being that BCBSMA mailed its appeal

6  denial letter about two weeks after the December 17, 2024 (inaccurate) date on its

7  letter.

8  **2.**  **THE EVIDENCE OVERWHELMINGLY SHOWS BCBSMA'S CLAIM**
9  **DENIAL WAS ARBITRARY, UNREASONABLE, CAPRICIOUS, AND**
   **INCORRECT**

10      **A.**  **Mr. Rogers' Appeal Must Be Deemed Resolved in His Favor**
11              **Because BCBSMA's Appeal Decision Was Untimely**

12      47.    Mr. Rogers' appeal must be deemed resolved in his favor because

13  BCBSMA's appeal decision was untimely under federal law.  The Plan provides

14  that a member's appeal of an adverse benefits decision that BCBSMA does not act

15  on "within the time frames specified by applicable federal or state law will be

16  considered resolved in favor of the member."  *See* Subscriber Certificate, Part 10, p.

17  86.  The applicable federal law, ERISA regulation 29 C.F.R. Section 2560.503-

18  1(i)(2)(ii), permits no more than 30 days for a decision on "pre-service claims"

19  under a group health plan that allows for one appeal of an adverse benefit

20  determination (like BCBSMA's Plan).  Specifically, that federal law states that the

21  plan administrator "shall notify the claimant . . . of the plan's benefit determination

22  on review . . . not later than 30 days after receipt by the plan of the claimant's

23  request for review of an adverse benefit determination."[16]

---

24  [12] *See https://www.postgrid.com/how-long-does-regular-mail-take-to-another-state/.*
25  [13] *See https://www.usps.com/service-standards/.*
    [14] *See https://www.easyship.com/blog/usps-weekend-delivery.*
26  [15] *See https://about.usps.com/newsroom/events/.*
    [16] The Plan terms require BCBSMA to make its appeal decision and notify the
27  member within the same period, 30 calendar days after it receives the member's
    appeal.  *See* Subscriber Certificate, Part 10, p. 86 ("The review and response for an
28  internal formal *appeal* or *grievance* review will be completed within 30 calendar

Footnote continues on next page…





48.     BCBSMA took longer than the 30 days allowed by federal law and the Plan documents.  BCBSMA took 51 days to notify the claimant Mr. Rogers of its appeal decision.  Mr. Rogers' counsel emailed and faxed his appeal to BCBSMA on November 18, 2024.  The administrative record confirms that BCBSMA received his appeal on that date.  Yet, BCBSMA did not notify Mr. Rogers of its appeal denial decision until January 7, 2025, 51 days later.[17]  That was three weeks after the expired, 30-day deadline.

49.     Moreover, this case involves Mr. Rogers' pre-service claims, so the federal ERISA regulation's 30-day deadline applies.  Dr. Ford and Mr. Rogers submitted claims to BCBSMA for his three oral surgeries and related services on March 13 and 26 and May 10, 2024.  Mr. Rogers submitted his anesthesia claims on June 11 and October 31, 2024.  Dr. Ford performed the surgeries on April 16, May 20, and October 4, 2024 (the latter two under general anesthesia).  Thus, Mr.

_____

days" and extended only if the appeal review requires the member's medical records "and [BCBSMA] needs your authorization to get these records.")  The Plan's 30-day limit applied here because the administrative record establishes that BCBSMA never asked Mr. Rogers for additional time to review his appeal, nor did it need, request, or obtain his authorization to get his medical records.  Instead, BCBSMA communicated with Dr. Ford's office and obtained Mr. Rogers' medical records directly from Dr. Ford without asking for, obtaining, needing, or providing Mr. Rogers' authorization to Dr. Ford, Mr. Rogers, or anyone else.  Thus, a 30-day limit applied to BCBSMA's duty to notify Mr. Rogers of its appeal decision both under federal law and the Plan's terms.  Because federal ERISA common and statutory law require strict enforcement of plan terms, the Plan document's 30-day period is also the "time frames specified by applicable federal or state law."  *See Heimeshoff v. Hartford Life & Acc. Ins. Co*., 571 U.S. 99, 108 (2013) (The Supreme Court emphasized the importance of enforcing plan terms in ERISA claims and stated that, "The plan, in short, is at the center of ERISA."); *id*. citing 29 U.S.C. § 1102(a)(1) ("And once a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'"); *id*. at 108 ("This focus on the written terms of the plan is the linchpin of" ERISA's system); *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100-101 (2013) (holding that "an administrator must act 'in accordance with the documents and instruments governing the plan'" because the "plan, in short, is at the center of ERISA" and because ERISA's "statutory scheme, we have often noted, 'is built around reliance on the face of written plan documents.'").
[17] Although BCBSMA's appeal denial letter is dated December 17, 2024, the reasonable inference from the evidence discussed above and below is that the December 17 date is an error.  That BCBSMA mailed its letter about two weeks after the date on the letter.  Mr. Rogers will attest under oath that he did not receive BCBSMA's "December 17" appeal denial letter until January 7, 2025, three weeks after the date on the letter.



1   Rogers' claims were submitted mostly before the medical services occurred, i.e.,

2   "pre-service claims."

3       50.    Because BCBSMA took longer than the 30 calendar days permitted by

4   federal law (and the Plan) to notify Mr. Rogers of its appeal decision in connection

5   with his pre-service claims, **his appeal is deemed granted by the Plan's terms**,

6   irrespective of its merits.

7       **B.   The Plan Covers, and Does Not Exclude Coverage for, Dr. Ford's
        Oral Surgeries**

8

9       51.    The Plan covers, and does not exclude coverage for, Dr. Ford's oral

10  surgeries because they were medical not dental care services.  That is the only

11  reasonable interpretation of the Plan.  When one considers the Plan's language and

12  ERISA plan interpretation rules, the inescapable conclusion is that some outpatient

13  oral surgery procedures performed by a dentist are covered medical services, not

14  excluded dental services, including the complicated oral surgeries that Dr. Ford, a

15  doctor of medical dentistry specializing in oral surgery, performed to sustain his

16  patient's general medical not dental health.

17      52.    When interpreting the terms of an ERISA plan or insurance policy,

18  courts generally apply federal common law, but they may also "borrow 'from state

19  law where appropriate and be guided by the policies expressed in ERISA." *Dowdy*

20  *v. Metro. Life Ins. Co*., 890 F.3d 802, 807-08 (9th Cir. 2018).[18]  BCBSMA's

21  convoluted argument that oral surgery to save a person's life and preserve his

22  medical health is "dental care" must fail because its argument would require the

23  Court to construe the Plan in a manner that violates ERISA contract interpretation

24  rules, ERISA policies, and the plain language of the Plan.  Applying federal contract

25  ─────────────────────

26  [18] The Plan has a Massachusetts choice of law provision for when state law is not
    preempted by ERISA.  However, federal common law preempts state law in the
    interpretation of an ERISA insurance policy or plan.  *See Dowdy*, 890 F.3d at 808

27  (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983)).  Thus, Ninth Circuit
    federal ERISA common law, the policies behind ERISA, and California state law

28  apply, not Massachusetts state law, because this case is venued in California in the
    Ninth Circuit where Mr. Rogers resides.



1    interpretation law in ERISA cases, "courts should first look to [the] explicit

2    language of the agreement to determine, if possible, the clear intent of the parties."

3    *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotation

4    marks omitted).  Moreover, "terms in an ERISA plan should be interpreted in an

5    ordinary and popular sense as would a person of average intelligence and

6    experience," according to the plain meaning of the words.  *Cyr v. Reliance Standard*

7    *Life Ins. Co.*, 525 F. Supp. 2d 1165, 1180 (C.D. Cal. 2007), quoting *Gilliam*, 488

8    F.3d at 1194 (internal quotation marks and alterations omitted).  It "is an abuse of

9    discretion to 'construe provisions of a plan in a way that clearly conflicts with the

10   plain language of the Plan.'"  *O'Rourke v. N. California Elec. Workers Pension*

11   *Plan*, 934 F.3d 993, 1001 (9th Cir. 2019).  Finally, and critically, the Court and

12   BCBSMA must interpret the Plan's insuring clause broadly and its exclusions and

13   limiting clauses narrowly.  *See MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648,

14   73 P.3d 1205, 1213 (2003), as modified on denial of reh'g (Sept. 17, 2003)

15   ("insurance coverage is interpreted broadly so as to afford the greatest possible

16   protection to the insured, [whereas] . . . exclusionary clauses are interpreted

17   narrowly against the insurer." (internal quotations and citations omitted)).[19]

18        53.    The Plan's insuring clause is very broad when viewed in the context of

19   these ERISA plan interpretation rules.  Part 5 Covered Services states that a member

20   has "the right to the coverage described in this part," except as excluded in Part 6.

21   Part 5 lists all sorts of "covered services" spanning 37 pages.  One of the covered

22

23   ―――――――――――――――
[19] This is consistent with the policies behind ERISA that apply when a court
interprets plan terms (or when an administrator like BCBSMA interprets them under
24   its discretionary authority to construe the Plan's terms), including an ERISA
administrator's duty of loyalty to interpret and apply the Plan's terms "solely in the
25   interest of the participants and beneficiaries" and "for the exclusive purpose of . . .
providing benefits to participants and their beneficiaries. . .."  *See* ERISA §
26   404(a)(1)(A), 29 U.S.C. § 1104(a)(1); *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90
(1983) (ERISA was enacted to "to promote the interests of employees and their
27   beneficiaries in employee benefit plans"); *Mass. Mutual Life Ins. Co. v. Russell*, 473
U.S. 134, 148 (1985) (ERISA policies are "to protect contractually defined
28   benefits"); *see generally* 29 U.S.C. § 1001 (setting forth congressional findings and
declarations of policy regarding ERISA).

services in the Plan's Part 5 insuring clause is "outpatient" surgical services if furnished by a "covered provider." The Plan's defines "outpatient" to include services performed in "a provider's office," and it defines "covered provider" to explicitly include "dentists," not just physicians. Thus, under the plain meaning of these words, BCBSMA clearly intended that some surgeries performed by a dentist in his office would be covered by the Plan's insuring clause, not just surgery performed by a physician. Here, Dr. Ford performed oral surgeries on Mr. Rogers in Dr. Ford's dental office in Huntington Beach. Dr. Ford is a dentist, specifically a D.D.S./D.M.D., a specialist doctor of medical dentistry, not a general dentist. Therefore, the plain language of the Plan's insuring clause covers Mr. Rogers' surgeries because they were "outpatient" surgeries performed by a "covered provider," i.e., a dentist, Dr. Ford, in his office.

54.    That the pertinent surgeries are covered becomes even more obvious because the Plan includes a list of examples of covered outpatient surgery services of which Dr. Ford's oral surgeries squarely fit within. *See* Subscriber Cert., Part 5 Covered Services, Surgery as an Outpatient, pp. 63-64. The broad list includes all sorts of outpatient surgeries, for example, breast reconstructions, transplants, and many others. Most important here, the Plan's list of covered outpatient surgeries include: (1) **Non-exhaustive examples** of "oral surgery," precisely the type of outpatient surgery Dr. Ford performed on Mr. Rogers; and (2) "Non-dental surgery" performed "by a dentist," again what Dr. Ford did. Specifically, the list states, "This coverage includes (**but is not limited to):** . . . ☐ Oral surgery . . . reduction of a dislocation or fracture of the jaw . . . excision of a benign or malignant tumor of the jaw; and orthognathic surgery . . . . [and] ☐ **Non-dental surgery . . . that is furnished for you by a dentist.**" *Id.* at pp. 63-64 (emphasis added). Because the Plan's list of covered outpatient oral surgery services is preceded and modified by the broad phrase "includes (but is not limited to)," the Plan covers all types of oral outpatient surgery, not just the specific listed examples. It also explicitly includes



oral surgery performed by a dentist like Dr. Ford, if the surgery is "non-dental."  It

follows that the Plan obviously covers all types of oral surgeries performed by a

dentist, not just the examples explicitly listed by the Plan, if they are medical and

not dental in nature.  That is how a person of average intelligence using an ordinary

and popular lens would interpret these Plan words (and how BCBSMA was required

to interpret) the plain meaning of these extremely broad Plan terms, especially

because BCBSMA was required to interpret the insuring clause broadly under

ERISA plan contract interpretation rules.

55.    As explained by Dr. Ford in his April 2024 opinion letters (summarized

in detail above), the surgeries he performed as a doctor of medical dentistry oral

surgeon specialist, not a general dentist, were medical services (not dental services).

For example, one of the many reasons he gave is that the services he performed are

designated with the American Medical Association's CPT medical services codes,

not the American Dental Association's CDT dental procedure codes.  Therefore, the

healthcare services that Dr. Ford provided Mr. Rogers are covered because he

provided outpatient, non-dental, medical oral surgeries, which clearly come within

the plain meaning of the Plan's Part 5 Covered Services exceptionally broad

insuring clause.

56.    Moreover, the Plan's Part 6 dental care exclusion, on which BCBSMA

relied to deny Mr. Rogers' claim and appeal, does not apply to the oral surgeries Dr.

Ford performed.  As mentioned, ERISA plan exclusions must be interpreted

narrowly against the insurer or drafter of the insurance contract.  *See MacKinnon*, 31

Cal. 4th at 648; *see also Los Angeles Lakers, Inc. v. Fed. Ins. Co*., 869 F.3d 795, 801

(9th Cir. 2017) ("Courts are to interpret coverage clauses in insurance contracts

'broadly so as to afford the greatest possible protection to the insured.'  In contrast,

courts are to interpret 'exclusionary clauses ... narrowly against the insurer.' "

(internal citations omitted)); *Citizens Ins. Co. of Am. v. MidMichigan Health

ConnectCare Network Plan*, 449 F.3d 688, 692 (6th Cir. 2006) (in ERISA health

plan case, holding that the "rules of contract interpretation that have evolved under
the federal common law in ERISA . . . disputes . . . an insurer has a duty to express
clearly the limitations in its policy; any ambiguity will be construed liberally in
favor of the insured and strictly against the insurer"); *Critchlow v. First UNUM Life
Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (finding that "hornbook rule of
contract interpretation" for ERISA plans is to strictly construe unclear exclusions
against the insurer and to read exclusions "narrowly rather than expansively" in
accordance with ERISA policies and "the congressional purposes of promoting the
interests of employees and beneficiaries and protecting contractually defined
benefits").  This narrow interpretation rule applies even when the plan includes a
clause granting the insurer discretion to construe the plan terms and the exclusion is
ambiguous.  *See Kunin v. Benefit Tr. Life Ins. Co*., 910 F.2d 534, 535-542 (9th Cir.
1990) (holding that unclear, ambiguous exclusion for "mental illness" in a group
ERISA health insurance policy must be strictly construed against the insurer as
drafter of the contract and in favor of the insured member, even where arbitrary and
capricious standard of review applied and, therefore, the court held the insurer's
denial of benefits was unreasonable, arbitrary, and capricious); *Lee v. Blue
Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1548-1551 (11th Cir. 1994)
(approving *Kunin* and holding that ambiguous dental care exclusion in ERISA
health insurance plan must be interpreted against Blue Cross/Blue Shield as the
drafter, even where the plan granted it discretionary authority to construe the plan's
terms).

57.    Indeed, an "insurer cannot escape its basic duty to insure by means of
an exclusionary clause that is unclear."  *MacKinnon* at 648.  An exclusion "must be
so stated as clearly to apprise the insured of its effect."  *Id*.  "Thus, the burden rests
upon the insurer to phrase exceptions and exclusions in clear and unmistakable
language."  *Id*.  An "exclusionary clause must be *conspicuous, plain and clear*."  *Id*.
(emphasis in original).  "This rule applies with particular force when the coverage

portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded," as is the case with BCBSMA's Plan. *Id.* Indeed, the words in an ERISA health insurance plan must be read in the context of the entire plan contract. *See Dupree v. Holman Prof'l Counseling Centers*, 572 F.3d 1094, 1097 (9th Cir. 2009) (When interpreting an ERISA health plan, a court must "look to the agreement's language in context and construe each provision in a manner consistent with the whole such that none is rendered nugatory."); *see also Cal. Civ. Code § 1641* (requiring contracts to be read as a whole, giving effect to every part). Finally, under federal ERISA law, the insurer bears the burden of proving that a policy exclusion applies, not the plan member.[20]

58.    The pertinent exclusion is unclear and, therefore, the interpretation that BCBSMA advocates is unreasonable and unenforceable. The exclusion vaguely states that "no benefits are provided for . . . dental care." But the Plan does not define "dental care." BCBSMA bears a heavy burden to prove that this unclear exclusion that it drafted applies here. Indeed, the Ninth Circuit has held in an ERISA group health insurance policy case that "the failure of the policy to define its terms is fatal to the insurer's attempt to limit payment." *Kunin*, 910 F.2d at 541. BCBSMA easily could have defined the key phrase "dental care" in its exclusion to clarify which oral surgeries were excluded. *In re Unisys Corp. Long–Term Disability Plan ERISA Litigation*, 97 F.3d 710, 715 (3d Cir. 1996) ("It is a simple task of draftsmanship to specify which offsets are applicable in any particular plan.") It should have because the person of average intelligence would not reasonably interpret the exclusionary phrase "dental care" to include a surgery performed by specialist doctor of medical dentistry and oral surgery to remove and

---

[20] *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) ("if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage"); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003), citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) (ERISA insurer and plan administrator "must carry the burden of proving the applicability of any plan coverage exclusion they seek to invoke").

1    replace severely infected and decayed teeth and jawbones caused by stomach

2    tumors, GI disease, chronic acid reflux, and chronic emesis, a surgery that was

3    medically necessary to save his life, prevent septic shock, organ failure, and

4    malnutrition, and to preserve his general medical not dental health.  Especially

5    because an exclusion must be interpreted narrowly with an eye toward providing

6    benefits per ERISA congressional policies and must be read in the context of the

7    other parts of the Plan, including the insuring clause for "covered services."  Here,

8    the insuring clause broadly covers all sorts of oral surgeries including non-dental

9    oral surgeries performed by a dentist specialist, which would lead a Plan member to

10   reasonably expect coverage for the purportedly excluded claim.  Because BCBSMA

11   did not clarify the specific scope of its unclear exclusion when it could have by

12   defining the term "dental care," the Plan must be interpreted against it and in favor

13   of Mr. Rogers.  *See MacKinnon*, 31 Cal. 4th at 648; *Kunin*, 910 F.2d at 541 (where

14   the phrase was unclear, "the failure of the policy to define its terms [phrase "mental

15   illness" in group ERISA medical policy exclusion] is fatal to the insurer's attempt to

16   limit payment," even when arbitrary and capricious standard of review applied); *see

17   also Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938,

18   942 (9th Cir. 1995) ("Mongeluzo argues that because the terms 'mental illness' and

19   'functional nervous disorder' are not defined in the plan, those terms must be

20   construed against the drafter. Mongeluzo is correct . . .")

21        59.    Because exclusions must be interpreted narrowly against the drafter of

22   a health insurance plan and must be stated in plain, clear and unmistakable terms,

23   because BCBSMA could have defined "dental care" but did not, because the Plan's

24   exclusion must be interpreted as a whole in the context of the other clauses in the

25   Plan, and because the Plan's insuring clause covers oral outpatient surgeries

26   provided by a dentist, the only reasonable interpretation of this unclear "dental care"

27   exclusion is that routine dental work like preventive dental exams, X-rays, fillings,

28   cleanings, and other general dentistry treatment is excluded because they are dental

services.  But that complicated oral surgery performed by a doctor of medical dentistry specialist with training and expertise in oral surgery like Dr. Ford (that general dentists cannot perform), and that is medically necessary to avoid the substantial decline in a patient's general medical health, is covered medical care, not excluded dental care.

60.    That the exclusion must be read in the context of the Plan as a whole is important.  Here, the Plan's insuring clause for "covered services" would lead an insured like Mr. Rogers to expect coverage for his purportedly excluded claim for Dr. Ford's oral surgeries.  The insuring clause includes all types of oral surgeries in the mouth area and "non-dental surgery" performed "by a dentist."  Furthermore, the Plan's definition of a "covered provider" explicitly includes "dentists," not just physicians.  That is the backdrop of which to read the exclusion for dental care.  When the unclear, undefined "dental care" exclusion is read in that context of these other Plan provisions (that broadly covers non-dental oral surgeries performed by a dentist), the only reasonable conclusion is that BCBSMA intended to cover oral surgeries performed by medical dentist specialists in oral surgery that are medical in nature.  That such an oral medical surgery performed by a dentist is covered, not excluded as "dental care."  If BCBSMA, with this backdrop of Plan language, wanted to exclude the medical oral surgeries that Dr. Ford performed just because they were in Mr. Rogers' mouth area or because he is a dentist, it easily could have explicitly listed jawbone grafts and implants, or all procedures performed by a dentist, in the dental care exclusion, or it could have defined "dental care" in the Plan to include those specific types of oral surgeries to make its intent clear and eliminate the ambiguity in the exclusion.  Because it did not and should have, and because exclusions must be interpreted narrowly in conjunction with the Plan's other provisions with an eye toward finding coverage, oral surgeries performed by a dentist that are medical in nature to save a member's life and general health are obviously covered and not excluded by the Plan.

-32-



61.    As set forth above, the evidence overwhelmingly shows that Dr. Ford's oral surgeries were medical services, not dental services, for many reasons.  First, the oral surgery services Dr. Ford performed – a full-mouth extraction and removal of Mr. Rogers' decayed, infected teeth and the deteriorated parts of his jawbones, bone grafts to build up his deteriorated jawbones, surgical stints, surgical installation of titanium implant anchors for prosthetic dentures in rebuilt jawbones – are designated with the American Medical Association's CPT medical service procedure codes, not the American Dental Association's CDT dental procedure codes.  If these were dental care services, they would have had corresponding ADA CDT procedure codes, not AMA medical service CPT codes.  Dr. Ford attested that the oral surgery services he performed on Mr. Rogers are classified under the AMA's CPT code system, not the ADA's CDT code system, because they are medical not dental procedures.

62.    Second, per Dr. Ford, only a doctor of medical dentistry with specialized training in complex oral surgery can perform the surgeries that Dr. Ford did, not a general dentist.

63.    Third, Dr. Ford explained that the procedures he performed, AMA CPT codes 21089, 20900, and 41899, "fall squarely within the medical domain, surpassing the scope of routine dental care," because of the "complexity, purpose, and application" of the procedures.  Further, he opined that these codes are "medical classifications" because: (1) They are AMA codes, not dental codes by the ADA; (2) The AMA categorized the codes as musculoskeletal system procedures, "a classification that clearly delineates"  them "as a medical procedure;" (3) The surgery "involves a level of invasiveness typical of medical interventions" and is performed by "professionals with advanced training in oral and maxillofacial surgery," typically performed by medical specialists in fields such as doctor of medical dentistry, oral and maxillofacial surgery, and other related disciplines; (4) They are complex surgery procedures that necessitate "specialized medical expertise

and training" and "a high level of specialized knowledge and skill in areas such as bone biology, surgical techniques, and postoperative care, characteristics commonly associated with medical professionals rather than general dental practitioners," further supporting the medical nature of these CPT codes; (5) "Despite involving the oral cavity, the procedure's intent—to facilitate speech through the placement of a bone-anchored device—exceeds the boundaries of traditional dental care, indicating a medical approach to treatment;" and (6) The codes are included in the "medical billing system" used by healthcare providers and health insurance companies, which "reinforces" their "status as a medical code." Dr. Ford summed up by opining that, for these reasons, these CPT codes fall "within the domain of medical practice, distinct from routine dental care."

64.    Fourth, Dr. Ford concluded that his patient's oral surgery was and "is medically necessary-not dentally." So did Mr. Rogers' highly decorated team of physician specialists, Drs. Panitch and Lipham, his longstanding board-certified family medicine physician and GI/oncologist surgeon who is a USC medical professor. They all concluded that the oral surgeries that Dr. Ford performed on their patient were medically necessary to prevent septic shock from reoccurring, prevent organ failure, sustain his life, and so that he could chew his food to become nourished, and speak properly. That without the surgeries, his general medical health, not dental, would have substantially declined to the point he would have become too weak to perform even basic life sustaining ADLs on his own. Indeed, Mr. Rogers' weight decreased from the 180s to the 150s before Dr. Ford performed the surgeries.

65.    Fifth, given the Plan's definition of "medically necessary," a healthcare service to help sustain a patient's life and prevent septic shock and organ failure, as in Mr. Rogers' case, is obviously a medical not dental service. The Plan defines "medically necessary" in pertinent part as a service that a healthcare provider would provide to a patient "in order to prevent or to evaluate or to diagnose or to treat an



illness, injury, disease, or its symptoms . . . essential to improve your net health outcome," not a service that "is primarily for your convenience . . . improves your appearance or how you feel about your appearance." That is precisely why Dr. Ford performed the oral surgeries here. He removed Mr. Rogers' rampantly decayed and infected teeth and jawbones to prevent these symptoms from his GI and stomach tumor problems from jeopardizing his general medical health, not as part of a dental or cosmetic procedure to improve his smile. Thus, the services must be classified as medical services, not dental care, considering the Plan's definition of "medically necessary."

66.     The fact that some oral surgeries in a member's mouth and jaw region are obviously covered medical not dental services by the Plan is further evidenced by the Schedule of Benefits (which is part of the Plan). The Schedule of Benefits states that the Plan covers all outpatient surgery except "removal of impacted teeth." The Schedule does not list any other outpatient surgery exclusions. "An impacted tooth occurs when a tooth fails to break through the gum line." *See https://aaoinfo.org/whats-trending/what-is-an-impacted-tooth/.* For example, a wisdom tooth that never comes in is an impacted tooth. So, outpatient surgery to remove an insured member's impacted wisdom or other impacted tooth is excluded by the Plan explicitly. Mr. Rogers did not have impacted teeth. He had severely rotted teeth above the gum line and severely deteriorated upper and lower jawbones. Thus, Dr. Ford removed Mr. Rogers' rotted (non-impacted) teeth and the deteriorated parts of his jawbones, performed bone grafts, and installed titanium implant anchors for prosthetic dentures to protect his medical health. The Schedule of Benefits does not exclude that type of oral surgery and broadly includes all other types of outpatient surgery. The only reasonable inference from this Plan language is that the Plan covers the type of oral surgery that Dr. Ford performed, but it excludes oral surgery to remove impacted teeth. If BCBSMA intended to exclude bone graft and implant oral surgery, it would have explicitly listed that as another



1    exclusion like it did impacted teeth removal.

2        67.    Multiple cases have found similar "dental care" exclusions in health

3    insurance plans inapplicable when the treatment in question, like here, involved the

4    mouth and was performed by a dentist but was primarily medical in nature. *See*

5    *Simpson v. State Mut. Life Assur. Co. of Am.*, 135 Vt. 554, 559, 382 A.2d 198, 201

6    (1977) (Vermont Supreme Court held that treatment for temporomandibular joint

7    syndrome ("TMJ") and jaw repositioning did not fall within the group medical care

8    policy's exclusion for "dental care and treatment," even though the work was

9    performed by a dentist, because that language, which is substantially identical to

10    BSBSMA's Plan exclusion, is unclear and susceptible to two different meanings

11    and, therefore, the court was bound to adopt the construction most favorable to the

12    insured); *Blair v. Metro. Life Ins. Co.*, 974 F.2d 1219, 1220-22 (10th Cir. 1992) (in

13    ERISA case, the court held the exclusion for "dental services of any kind" in group

14    medical policy was unclear and had to be construed in favor of the employee

15    because the policy did not clearly define whether dental services included treatments

16    for conditions involving muscles and joints, which incidentally involved teeth, under

17    federal ERISA common law trust contract interpretation principles even if the state

18    law insurance policy interpretation principle of contra proferentem was not applied);

19    *Arkansas Blue Cross & Blue Shield v. Thomas*, 1992 WL 74356, at *1-2, 4 (Ark. Ct.

20    App. Apr. 8, 1992) (holding that braces, bridges, and crowns to correct TMJ

21    performed by an orthodontist not excluded under group medical policy's exclusion

22    for "dentistry," an undefined term in the policy, because the exclusion language was

23    unclear); *Goss v. Medical Serv. of the Dist. of Columbia*, 462 A.2d 442 (D.C. Cir.

24    1983) (the court held that the placement of crowns and bridges in the teeth of a

25    patient in the course of treatment for TMJ did not fall within the meaning of the

26    term "dentistry" as provided in an exclusion); and *Celtic Life Ins. Co. v. Fox*, 544

27    So. 2d 245, 248 (Fla. Dist. Ct. App. 1989) (the court concluded that treatment for

28    TMJ syndrome was not excluded under the dental care exclusion, as it was



considered a medical condition rather than a dental one).

68.     That BCBSMA's claim denial reasoning is arbitrary, capricious, and incorrect is bolstered by the fact that it changed its reasoning several times during the claims process.  In addition to the incorrect reason it stated in its formal written denial letters, BCBSMA also said that the Plan does not cover services performed by a DMD or dentist like Dr. Ford, nor medical claims submitted for pre-authorization before the services are performed (as occurred here).  Both denial reasons are obviously incorrect and were a pretext to deny Mr. Rogers' covered claims for medical services.  BCBSMA's website lists several in-network DMDs and even dentists.  The Plan explicitly states in more than one place that it covers services performed by a dentist.  *See* Subscriber Cert., Part 5, p. 64 ("covered services" include outpatient surgery "that is furnished for you by a dentist"), Part 2, p. 12 ("covered providers" include "dentists").  Moreover, the Plan has a pre-service approval process.  *See* Subscriber Cert., Part 4, pp. 25-26, Part 9, p. 82. Conspicuously, BCBSMA did not include those pretextual reasons in its written denial letters.  In short, BCBSMA arbitrarily rifled off several incorrect reasons to deny Mr. Rogers' oral surgery claims (including the one in its written denial and appeal denial letters), in the hopes that it could discourage Mr. Rogers from pursuing them because BCBSMA does not want to honor the Plan documents and pay for his covered, medically necessary, oral surgery medical services.

**C.    The Plan Covers Dr. Hussain's Anesthesia Services Because He Administered It for a Covered Service – Dr. Ford's Oral Surgeries**

69.     The Plan covers Dr. Hussain's anesthesia services because he administered the anesthesia to Mr. Rogers during Dr. Ford's oral surgeries.  Because Dr. Ford's surgeries are covered, the Plan also covers the anesthesia for those covered surgeries.  The Plan's broad insuring clause states that anesthesia services related to covered surgery is a covered service.  BCBSMA does not dispute that. Instead, BCBSMA denied coverage for anesthesia on the sole grounds that the



Plan's non-covered service exclusion applies. That exclusion states, "No benefits are provided for: . . . A service or supply that is furnished along with a non-*covered service*." (Italic emphasis in original to delineate defined terms). BCBSMA reasoned that because the Plan does not cover Dr. Ford's surgeries, the accompanying anesthesia is also excluded. That rationale is unreasonable and clearly incorrect. Because Dr. Ford's surgeries are covered for all the reasons discussed above, Dr. Hussain's related anesthesia services are also covered and not excluded.

### D. <u>The Standard of Review</u>

70.    Regardless of the standard of review this Court applies, Defendants reached an incorrect decision and abused their discretion, given the overwhelming medical records and other evidence presented during the claim that established that the procedures performed on Plaintiff were covered medical services within the meaning of the Plan.[21]

71.    Even if an abuse of discretion standard of review applies, the Court must apply a heightened degree of skepticism to BCBSMA's denial decision because BCBSMA funded the Plan's healthcare benefits and decided Mr. Rogers' claim. *Gary v. Unum Life Ins. Co. of Am.*, 831 F. App'x 812, 813 (9th Cir. 2020), citing *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009) ("A plan administrator like Unum, responsible for both assessing and paying out claims, is subject to a structural conflict of interest, so the court must 'adjust the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision in accordance with the facts and circumstances of the case.'"); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011) ("We must judge the reasonableness of the plan administrator skeptically where, as here, the administrator has a conflict of interests.")

---

[21] The proper standard of review is de novo because any discretionary language in the Plan is void under state statutes and laws.



72.    The Court must assess BCBSMA's benefits denial decision even more skeptically because it acted upon that conflict as demonstrated by its several procedural violations of ERISA during its appeal review.  *See Hoffman v. Screen Actors Guild Producers Pension Plan*, 757 F. App'x 602, 604 (9th Cir. 2019) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959, 971 (9th Cir. 2006) ("Where there are 'procedural irregularities' in the claim review process, the abuse of discretion standard that is applied by the district court will be 'tempered' by heightened skepticism," and courts "must consider all the circumstances in determining how much weight to assign to a conflict or procedural irregularity.") BCBSMA failed to provide the "full and fair review" of Mr. Rogers' appeal that ERISA requires, *see* 29 U.S.C. § 1133(2), including, without limitation, because it violated ERISA procedures during its review in many ways:

- BCBSMA failed to timely decide Mr. Rogers' appeal and notify him within the 30-day deadline required by the Plan and federal ERISA law, 29 C.F.R. Section 2560.503-1.  *See* Complaint Section 2A., above.  That is an ERISA procedural violation that warrants heightened skepticism.  *See Abatie*, 458 F.3d at 971-972 (a conflict of interest or an ERISA procedural irregularity can heighten judicial scrutiny in deciding whether the plan administrator abused its discretion, including where the administrator fails to follow the ERISA notice and claims processing procedures set forth in 29 C.F.R. Section 2560.503-1).

- BCBSMA, because it failed to timely notify Mr. Rogers of its appeal decision within the 30-day requirement, attempted to mask its non-compliance by backdating its appeal denial letter or neglecting to change the letter's date from December 17, 2024 to the date that it mailed the letter (which was closer to January 7, 2025 when Mr. Rogers received the letter in the mail, not the inaccurate December 17 date on the letter).  *See Abatie*, 458 F.3d at 968 (a plan administrator's structural conflict of interest accompanied by, for

example, evidence of malice warrants heightened skepticism of its benefits
decision).[22]

- BCBSMA furthered its effort to mask its non-compliance because it sent its
appeal denial decision directly to Mr. Rogers, not his lawyer, despite that
counsel prepared his appeal and BCBSMA knew he was represented by
counsel.

- BCBSMA failed to produce its complete administrative record to Mr. Rogers'
counsel when counsel requested it on January 10, 2025 (after the appeal
decision), including all documents submitted by the Plan participant Mr.
Rogers as part of his appeal.  BCBSMA responded on January 30, 2025 and
produced only part of its record, 265 pages.  It failed to include all the
numerous supporting documents counsel sent to BCBSMA with his appeal.
That violated ERISA and its associated regulations, 29 U.S.C. Section
1133(2) and 29 C.F.R. § 2560.503-1(h)(2)(iii), (h)(3) and (m)(8).  It is an
ERISA procedural violation that warrants heightened skepticism of the plan
administrator's denial decision.  *See Hoffman*, 757 F. App'x at 604-605
(heightened skepticism warranted because "Hoffman advanced new evidence
of multiple procedural irregularities in the Plans' review of her application for
benefits, including the Plans' failure . . . to make available evidence relevant
to the Plans' decision, such as the administrative record").

- Because BCBSMA failed to include these critical appeal letter enclosures in

---

[22] Although BCBSMA's appeal denial letter is dated December 17, 2024, Mr.
Rogers did not receive the letter until January 7, 2025, three weeks and 17 business
days after the obviously misdated letter.  The reasonable inference from (1) the
administrative record evidence discussed above (no evidence in record that the letter
was mailed on December 17, just that it was sent to BCBSMA's mailroom on that
date during the Holidays, when BCBSMA should have had a receipt of the mailing
date since it sent the letter certified mail), and (2) the standard time to mail a letter
from Massachusetts to California (five business days), is that BCBSMA backdated
its letter or held on to it for a lengthy period after December 17 without changing the
inaccurate date before it mailed the letter to Mr. Rogers.  The most reasonable
inference is that BCBSMA mailed its letter about two weeks after the date on the
letter and then attempted to hide its mistake by not changing the date and failing to
include the USPS certified receipt of the mailing date.



its administrative record, it obviously did not even review or consider them as part of its appeal decision and, therefore, did not fulfill its duty of a "full and fair review."  There is no evidence in its record that it reviewed the appeal enclosures.  In its contemporaneous claim logs, BCBSMA failed to note receipt, review, summary, or consideration of any of these documents as part of its appeal review.  No other part of the administrative record documents that BCBSMA considered Mr. Rogers' appeal letter enclosures.  That is a significant, major violation of ERISA and warrants a lot of heightened skepticism.[23]  The insurance company *totally ignored **all** the evidence* that Mr. Rogers' counsel sent with his appeal letter.  That is far from the "full and fair review" of his appeal required by ERISA.

- BCBSMA failed to engage in a "meaningful dialogue" because its cursory appeal denial letter does not address most of the arguments Mr. Rogers raised in his detailed appeal letter.

- BCBSMA shifted its denial rationale from what it told Mr. Rogers on the phone and via EOBs to what it put in its formal denial letters.  It shifted rationales several times: (1) From the Plan does not cover pre-service claims; (2) To it does not cover work performed by dentists; (3) To the procedures were not medically necessary.  BCBSMA abandoned those reasons in its formal denial letters and denied Mr. Rogers' claims based purely on the dental care and non-covered services exclusions.

**E.    Exhaustion of Administrative Remedies**

---

[23] *See* 29 U.S.C. § 1133(2); *Abatie*, 458 F.3d at 968 ("A court may weigh a conflict more heavily if, for example, the administrator . . . fails adequately to investigate a claim or . . . fails to credit a claimant's reliable evidence . . . ."); *Hoffman*, 757 F. App'x at 604-605 (heightened skepticism warranted because "Hoffman advanced new evidence of multiple procedural irregularities in the Plans' review of her application for benefits, including the Plans' failure to consider all relevant evidence . . . ."); *Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.")

73.     Plaintiff exhausted his administrative remedies under the Plan and has the right to bring a legal action for benefits under ERISA Section 502(a). BCBSMA's December 2024 appeal denial letter concedes as much, that Mr. Rogers has "the right to bring a lawsuit under Section 502(a) of ERISA" and that BCBSMA's appeal denial letter "completes the internal appeal process for this request."  The Plan does not require a member to go through the Plan's external review process:  "[Y]ou have the right to an external review. You are not required to pursue an external review."

### **FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment Interest Under ERISA Plan –

29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against BCBSMA and Does 1 through 10)

74.     Plaintiff incorporates the previous paragraphs of this Complaint as though fully set forth herein.

75.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

76.     At all times relevant, Plaintiff has been entitled to healthcare benefits under the Plan.  By denying Plaintiff's ongoing claims for healthcare benefits under the Plan, and by related acts and omissions, Defendants violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.

77.     Defendants have failed to follow even the most rudimentary claims processing requirements of ERISA and of the Department of Labor Regulations and have failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Defendants to make benefit determinations, no deference is warranted with regard to Defendants' handling of this claim. *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d



1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

78.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the participants and beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.  Defendants' handling of Plaintiff's healthcare benefit claims fall far short of these standards.

79.    For all the reasons set forth above, BCBSMA's decision to deny healthcare benefits to Plaintiff was arbitrary, capricious, wrongful, unreasonable, irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and contrary to law.  Defendants improperly denied this claim(s), as the evidence shows their denial decision was not only incorrect but arbitrary and capricious.  Further, Defendants' denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Defendants' denial of Plaintiff's claim(s) was incorrect and improper, based upon all the evidence discussed herein.

80.    Alternatively, Plaintiff has met the burden of establishing he is entitled to healthcare benefits under a de novo standard of review, including, without limit, for the oral surgeries, anesthesia, and related healthcare services that were provided him on April 16, May 20, and October 4, 2024.



81.    As a direct and proximate result of Defendants' denial of healthcare benefits, Plaintiff has been deprived of benefits from and after May 22, 2024.

82.    As a direct and proximate result of the denial of his claim(s) for healthcare benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

83.    A controversy now exists between the parties as to whether Plaintiff is entitled to healthcare benefits under the terms of the Plan.  Plaintiff seeks the declaration of this Court that he meets the Plan terms and is entitled to healthcare benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim(s) that is consistent with the terms of the Plan.

84.    Plaintiff alleges all of the same conduct against Does 1 through 10 as he does against BCBSMA in this First Claim for Relief and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.    For all Plan benefits due and owing Plaintiff, including healthcare Plan benefits for his oral surgeries, anesthesia, and related services;

2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g);

3.    For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, at the rate he was receiving on his lost



investments, if any, and/or due to the financial distress Defendants' denial decision caused him, or at a different rate as permitted by federal law; and

4.    For such other and further relief as this Court deems just and proper.

Dated:  July 10, 2025                    **McKENNON LAW**

By:     ROBERT J. McKENNON
        JOSEPH S. McMILLEN
        Attorneys for Plaintiff Eric Rogers

